[Civ. No. 16290. Second Dist., Div. One. July 2, 1948.]

B. L. HOAG, Respondent, v. VINCENT L. JENAN et al., Appellants.

Riccardi, Webster & Donohue and Rinehart, Merriam, Parker & Berg for Appellants.

Robert M. Holstein for Respondent.

YORK, P. J.—This is an appeal from that portion of the judgment herein rendered awarding plaintiff the sum of $15,000 as damages for the alleged breach of a supplemental leasing agreement, by the terms of which defendants covenanted to build an addition to and make certain alterations in an existing garage building then occupied by plaintiff as defendants' lessee.

The award of damages was predicated upon the following findings of the trial court:

"That it is true that on the 21st day of July, 1944, the plaintiff and defendants entered into a written building lease agreement, whereby the defendants, among other things, agreed to build an addition to the premises occupied by plaintiff under the terms of said lease;

"That it is true that on the 25th day of September, 1945, plaintiff and defendants entered into a written amendment

to said building lease agreement, wherein said plaintiff and defendants agreed that the defendants would commence the construction of an addition within ten days from the date of said amendment to said building lease agreement, and that said defendants further agreed to substantially complete the annex within seventy-five days from the date of commencement of said work;

"That it is true that the defendants failed to substantially complete the annex until the 13th day of August, 1946.

"That it is true that the plaintiff, prior to the execution of the original agreement and up to the date of the trial of this action was engaged in the motor vehicle repair business and in the business of selling both new and used motor vehicles, with his principal place of business located on the premises covered in said building lease agreement and said amendment to said building lease agreement; . . .

"That it is true that by reason of the defendants' failure to substantially complete the addition within the time prescribed by the amendment to the building lease agreement the plaintiff was prevented from expanding his repair service in his said business, and he has thereby suffered loss of profits, and has been damaged in the sum of fifteen thousand dollars ($15,000); . . ."

In addition to that part of the judgment awarding damages to plaintiff, from which this appeal is taken, the judgment also decreed that appellants should receive from respondent the sum of $10 per month additional rent from August 13, 1946, to the date of expiration of the amended lease.

The evidence presented at the trial herein established that respondent had been the factory representative for Plymouth and De Soto automobiles in the city of Alhambra since 1932, and that appellants were the owners of a garage building in that city; that on the 21st of July, 1944, appellants leased said building to respondent for a period of five years; that the building consisted of a showroom for new cars, office space, parts department, and in the rear a service or repair department. At the time the lease was executed, respondent was devoting his entire operations in the building to the repair of used cars, as no new cars were then being manufactured for sale. The floor space in the service department was not large enough to accommodate the business that was being offered to the repair department, and the lease provided that appellants would commence building an annex to the repair shop "as soon as the materials necessary therefor were avail-

able to them,'' and would complete the building "as soon as reasonably practical under existing conditions." For some 14 months after the execution of said lease nothing was accomplished in the way of commencement of such building operation, although the parties had many discussions with respect to the delay: appellants claiming the building materials were not available to them, and respondent contending that he was in need of additional space to carry on the expansion of his repair work. At the end of this period and prior to September 25, 1945, the parties commenced negotiating for an amendment to the lease for the purpose of fixing a definite time within which respondent could be assured that the annex would be constructed. As a result of such negotiations, an amendment to the lease was executed on September 25, 1945, whereby appellants agreed to commence the construction of the annex within 10 days from the date of such amendment and to complete the same within 75 days from the commencement of the work, to wit: by the 20th of December, 1945.

The annex was not completed until August 13, 1946, or approximately eight months after the date agreed upon. In the meanwhile, on March 7, 1946, respondent filed the instant suit for damages for loss of profits that he would have realized had the annex been constructed within the time prescribed.

Respondent's complaint alleged two causes of action: (1) damages for loss of profits based upon a breach of the original lease with respect to the time of performance of the remodeling provisions thereof; and (2) damages predicated upon a breach of the lease, as amended. At the beginning of the trial, respondent waived any claim for damages under the first cause of action, and the cause was tried upon the theory that the respondent would have doubled his net profits in his service and repair department if appellants had not breached the lease, as amended.

Appellants here urges that the "award of $15,000 in damages is made because of respondent's alleged inability to expand his automobile repair service, and not because of any act or omission of appellants which resulted in any interference or interruption of the existing business of respondent."

To this respondent replies: "Respondent has consistently contended, and this case was tried upon the theory that he was prevented from increasing his business volume by the

omission of appellants to provide him with the necessary space in which to expand his operations."

There was testimony presented to the effect that from the date of the execution of the amendment to the lease, i. e., September 25, 1945, to the date of completion of the annex, i. e., August 13, 1946, respondent "rejected more than half, possibly three times the work that was offered to us." Also, that from January of 1946, through August of 1946, "there was a lot more repair work than we were able to take care of. . . . We made no effort to get any business at all, because we were getting more business than we could do as it was"; that during this period there were four service stalls in the old shop, which were being overworked because "a mechanic is suppposed to have a stall and a half to do efficient work. Three men were working in four stalls, which would be crowding the area for three mechanics. . . . two men working an area should have one space of their own and the area to do work on while the car he is working on is being tied up. In other words, you might take a part out of a car, and it takes a little while to get it from—it is like fitting pistons and so on. That is a job that is done away from the car some place by somebody else. A mechanic don't do that. . . . They were objecting all of the time to the area we were working them in. . . . Too crowded. There was too much confusion getting cars in and out for them to work on. . . . they (mechanics) can make plenty of money, so, if you don't give him working conditions he can go and get a job some place else." At all times before the annex was completed there were three first-line mechanics working at full capacity and there was no room for more.

Respondent's certified public accountant testified that he made a joint survey with appellants' accountant of the books of respondent to determine the net profit of the parts and service department from January 1, 1946, through August, 1946; that this survey was based upon the Chrysler Motor method which was in keeping with the system of bookkeeping then used by respondent pursuant to instructions from the factory. It was stipulated that respondent's Exhibit 6, the worksheet of the accountant, correctly reflected the books of respondent. This worksheet disclosed that the gross sales of parts and labor in the repair shop from January 1, 1946, to August 31, 1946, were $64,447.48, and that the net profit for this period was $11,295.29.

When the annex and remodeling work agreed upon in the lease, as amended, was completed, the additional floor space provided room for nine working stalls for mechanics, instead of four, an additional stall for a front-end machine for front end adjusting of vehicles, two stalls for grease hoists, and a stall for a wash rack. A short time before the annex was completed, respondent hired three additional first-line mechanics, who went to work immediately upon the completion of the annex.

Respondent's profits were derived primarily from the sale of automobile parts used in repair work and from the profit realized from charges made for mechanics' labor in installing these parts. They are referred to as sales of parts and sales of labor. Based upon the assumption that the sales of parts and labor would have doubled in the parts and service department of the repair shop had the annex been available to respondents from January 1, 1946, to August 21, 1946 (the approximate period of default), respondent's accountant testified that the assumed net profit would have been in the sum of $34,002.84. In answer to the question: ''What would have been the increase over the original operation, that is, the operation assuming that the sales had not doubled?,'' the witness stated: ''There would have been a net then of $22,707.55. . . . That is the difference between the assumed net profit and the actual net profit. . . . on the basis of these assumptions, the net difference would have been $2,838.44 per month.''

Appellants presented evidence to the effect that before they entered into the amended agreement they had the assurance of their contractors, the Sierra Construction Company, that they had available or could obtain all of the necessary materials to complete the job, but owing to the inability of the company to obtain certain critical building materials, to wit: mainly brick, which was the material appellants preferred to use, the work was not completed in time. Opposed to this, there was testimony that concrete blocks were available in the particular locality in sufficient numbers to construct the proposed annex during the period from August to December, 1945, and that this material was used in the construction of several buildings proposed to be used for commercial purposes in the city of Alhambra during this time.

While appellants urge that no award of damages in any amount should have been made herein, there is respectable authority sustaining awards of damages resulting from the

loss of prospective or future profits. In the case of *Shoemaker* v. *Acker,* 116 Cal. 239, 244 [48 P. 62], it is stated: " 'Prospective profits,' as damages, present one of the most difficult subjects with which courts have to deal. It is not the law, however, that they can never be recovered. Our own code states the rule to be that the measure of damages for the breach of a contract is 'the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which *in the ordinary course of things would be likely* to result therefrom.' (Civ. Code, sec. 3300.) An examination of. the authorities will show that the cases in which future profits were rejected as 'speculative' or 'too remote' were cases where the asserted future profits were entirely collateral to the subject matter of the contract, and not consequences flowing in a direct line from the breach of such contract. Familiar instances of profits which are thus speculative and remote are those which might have been realized on a new contract with a third person which could have been consummated with the proceeds of the contract sued on if the latter had not been broken; for in such a case the profits on the new contract are wholly collateral to the one broken, do not flow directly from it, and are not stipulated for or contemplated by the parties to the contract sued on. But where the prosepective profits are the natural and direct consequences of the breach of the contract they make be recovered; and he who breaks the contract cannot wholly escape on account of the difficulty which his own wrong has produced of devising a perfect measure of damages. (Sutherland on Damages, 2d ed. sec. 64, 72, 107, 120; *Masterson* v. *Mayor,* 7 Hill, 61 [42 Am.Dec. 38]; *United States* v. *Behan,* 110 U.S. [388] 344 [48 S.Ct. 81, 28 L.Ed. 168]; *Rice* v. *Whitmore,* 74 Cal. 619 [16 P. 501, 5 Am.St.Rep. 479]; *Hale* v. *Trout,* 35 Cal. 229; *Stoddard* v. *Treadwell,* 26 Cal. 308; *Cederberg* v. *Robison,* 100 Cal. 98, 99 [34 P. 625]; *Tahoe Ice Co.* v. *Union Ice Co.,* 109 Cal. 242 [41 P. 1020].) In Sutherland on Damages, section 64, the author, after speaking of profits which *are* too remote, says—quoting from a decided case: 'But profits are advantages which are the direct and immediate fruits of the contract entered into between the parties stand upon a different footing. These are part and parcel of the contract itself, entering into and constituting a portion of its very element; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. They are presumed to have been taken into consideration and deliberated upon be-

fore the contract was made, and formed, perhaps, the only inducement to the arrangement.' "

■ The instant case involves the loss of prospective profits from an established business, and in such cases the authorities unanimously hold that the loss of prospective profits are ordinarily recoverable, for the reason that the working experience of the business affords a reasonable method of determining the loss, and that in such cases the damages occasioned by the loss are not speculative and uncertain. See *Jegen* v. *Berger*, 77 Cal.App.2d 1, 16 [174 P.2d 489], where it is stated: "In the instant case, respondent had been in the laundry business 11 years; it could reasonably be inferred therefrom that he knew the ratio of his operating expenses to his gross volume of business handled. The jury would be justified in believing his testimony that when the new mangle was installed in April, 1942, his then operating volume was only 25 per cent of what that mangle could actually produce. His testimony that he had to turn business away—coupled with the fact that it was common knowledge that all laundries during the war years could get about as much business as they thought they might handle—would give some reasonable basis for his estimate that his business would have increased 10 per cent per month until the mangle's capacity was reached in December, 1942."

Appellants also urge that "the trial court has misconceived the measure of damages applicable to building and lease contracts, and has erroneously applied to the case at bar a measure of damages only applicable in tort cases or in cases involving breach of warranties." In support of this argument, appellants cite, among others, the case of *Weiss* v. *Revenue Building & Loan Association*, 116 N.J.L. 208 [182 A. 891, 104 A.L.R. 129], which involved a claim for damages because of respondent's inability to extend his apartment house operations into an adjoining area which had been leased to respondent by appellant. In that case the following rule was enunciated:

" 'Where a lessor has prevented the lessee from entering and occupying the leased premises, or where an owner of property has broken his agreement to give a lease thereof to a prospective tenant, the measure of damages in an action for this breach of contract, if no rent has been paid, and if nothing further appears, is the difference between the actual value of the leasehold estate that should have been enjoyed and the agreed rental that was to have been paid therefor.'

But, in the ascertainment of the value of the term, the apposite rule, in the absence of special circumstances, is the difference between the actual rental value and the rent reserved."

It should be observed that the court in the cited case commented as follows: (p. 131 [104 A.L.R.]) "There is a well-established distinction, in respect of the ascertainment of future probable profits, between a new business or venture and one in actual operation. In the first, the prospective profits are too remote, contingent and speculative to meet the legal standards of reasonable certainty; while in the second, the provable data furnished by actual experience provides the basis for an estimation of the quantum of such profits with a satisfactory degree of definiteness. (Citation of authorities.) In the one case, the success of the business usually depends upon a variety of circumstances, and the outcome is therefore too uncertain to provide a tangible basis for computation; while in the other, past experience has demonstrated the success of the enterprise and provides a reasonably certain basis for the calculation of plaintiff's probable loss consequent upon the breach of the contract to lease.

"The instant case falls into the former category."

■ Applying the rule last above quoted, the case at bar falls into the second category mentioned in that the business here is in actual operation, its past experience has demonstrated the success of the enterprise, and provides a reasonably certain basis for the ascertainment of the probable loss consequent upon the breach of contract to complete the annex within the time specified.

See *Grupe* v. *Glick*, 26 Cal.2d 680 [150 P.2d 832] and also 104 A.L.R. p. 157, where it is stated: "The earlier decisions both in England and in this country generally excluded profits altogether as an element of recoverable damages in both actions for breach of contract and for tort. But this rule, under more modern practice, has been generally abandoned in both classes of action, and, as a result, the right to recover profits is now generally determined by the same rules as govern the recovery of other damages. It may therefore be said that lost profits are a proper element of damages, when such loss is the direct and necessary result of the defendant's acts, or where the loss of profits may reasonably be supposed to have been within the contemplation of the parties when the contract was made, as the probable result of its violation, and where such profits can be shown with a reasonable degree of certainty. 8 R.C.L. p. 501."

In the case here before this court, the damages awarded were within the contemplation of the parties at the time the amended agreement was made. The only purpose of the amendment was to reassure respondent that the additional space would be supplied him in the immediate future so that he should not suffer any more damage by way of loss of profits because of lack of space in which to operate an existing and established business.

▇ The evidence presented herein amply supports the findings and the judgment awarding $15,000 damages.

▇ Appellants finally urge that respondent failed to avail himself of his legal remedies to complete the proposed annex at the expense of appellants, or to rent or construct other suitable garage space. With respect to this phase of the case appellants at no time refused to construct the annex, but repeatedly assured respondent that they would commence building within a week or so; that they would build as soon as they could get the necessary materials, and although respondent was under no duty to do so, he interviewed other contractors who stated they had the materials and offered to build the annex, and he so advised appellants. Moreover, in February, 1946, respondent commenced the erection of a Quonset Hut on adjoining property in order to take care of the overflow of work, and completed this structure in April, 1946. Under the amended agreement, respondent had no right to build at appellants' expense, and he was under no obligation to do so. As a result, the evidence is sufficient to support an implied finding that respondent exercised reasonable care to avoid loss or minimize damages.

For the reasons stated, that portion of the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 26, 1948.