[Civ. No. 5810.   Fourth Dist.   June 23, 1958.]

HOLMESTAKE MINING COMPANY (a Corporation), Respondent, v. W. S. TALCOTT et al., Appellants.

Chase, Rotchford, Downen & Drukker for Appellants.

Brandt & Baker and Charles F. Sturdevant, Jr., for Respondent.

MUSSELL, J.—This is an action for damages for breach of an ore milling contract. Defendants appeal from a judgment in favor of plaintiff and contend that the findings of the trial court are not supported by the evidence.

Plaintiff corporation owned and operated an ore treatment mill in Winterhaven, Imperial County, California, and the defendant partnership owned mineral leases to an ore deposit in Arizona containing molybdenite and chalcopyrite. On July 16, 1954, plaintiff and defendants entered into a contract

in writing in which plaintiff agreed to mill for defendants molybdenum and copper ore to be produced by defendants from their mining claim. Defendants agreed to produce and ship the ore to be milled to plaintiff's mill at their sole cost and expense. Plaintiff agreed to mill the ore in good workmanlike manner and to deliver the concentrates therefrom in bins at the millsite. Defendants agreed to pay plaintiff the actual cost of milling plus 50 per cent thereof and to furnish plaintiff sufficient ore for the milling of a minimum of 50 tons per day, commencing not later than the first week in August, 1954. They agreed to maintain sufficient ore in the bins and stockpiles to permit such operations. Defendants agreed to mill not less than 9,000 tons of ore under the agreement and that the 50 tons per day might be increased to 100 tons per day at their option. It was also agreed that additions to the mill equipment might be necessary to handle the ore, in which event the cost of such additional equipment was agreed to be borne exclusively by the defendants. Accurate records were to be kept by plaintiff of the milling operations and it was estimated by plaintiff that the milling operation, plus 50 per cent thereof, would not exceed $7.00 per ton. However, it was distinctly stipulated that said sum was an estimate only and not a guarantee as to the cost of such milling operations. It was further agreed that plaintiff was entitled to recover from defendants the sum of $1.00 per ton on the ores milled as depreciation costs. It was further stipulated that the general manager of plaintiff corporation should be in exclusive control and management of the milling operations.

Prior to the execution of this agreement, Mr. Holmes, president of plaintiff corporation, had a discussion with the defendants in which they agreed to ship plaintiff a sample of the ore which defendants could supply for milling so that plaintiff might ascertain the mineral content of the ore and determine whether it could be economically processed. During the early part of July, 1954, defendants shipped to plaintiff a 200-pound sample of this ore for test purposes. Plaintiff ran tests on the submitted sample and found that the ore contained 15.3 per cent molybdenum sulfite and approximately 5 per cent copper. Plaintiff then advised defendants of the results of these tests and that plaintiff could make a good separation of the molybdenum sulfite and the copper ore.

Defendants failed to furnish ore for the commencement of milling operations on August 1, 1954, as specified in the contract, and the first shipment consisting of three carloads did

not arrive in Yuma until August 10, 1954. The record shows that to operate the mill properly and to make a good recovery of the mill concentrates it was necessary that the mill be operated continuously 24 hours per day. The defendants did not supply ore in sufficient quantities to maintain a sustaining milling rate of 50 tons per day, the minimum specified in the contract. Therefore, plaintiffs could only operate the mill spasmodically because of the lack of ore.

Defendants did not ship ore which conformed to the test sample submitted but shipped ore which was highly oxidized, thereby making it difficult to recover the concentrates therefrom. However, the ore shipped was milled to the specifications furnished by the defendants.

On September 9, 1954, defendants sent a letter to plaintiff instructing the plaintiff to complete the milling of a car of ore then in transit and all ore then on hand as soon as possible and to immediately thereafter reduce expenses and retain a skeleton crew of not more than three persons who would rerun the molybdenum concentrates and that "After the molybdenum concentrates have been re-run, you are to cease all operations under the contract." In accordance with these instructions plaintiff milled all of the ore shipped and the mill was closed down on September 15, 1954. Plaintiff then retained a skeleton crew, Mr. Holmes, president of the plaintiff corporation, and two men who had been employed by plaintiff under a six months' contract in contemplation of the milling contract with the defendants. No further ore was shipped subsequent to the receipt of this letter from the defendants and the record shows that the defendants shipped only 741 tons of ore under the contract.

The first contention of defendants is that the findings of the trial court "That plaintiff duly performed all the conditions of the said contract to be by it performed and was for the duration of said contract ready, willing and able to perform said contract", and "That after September 15, 1954, plaintiff, pursuant to said contract, maintained said mill in operating condition for the remainder of the contract at a cost to plaintiff of $8,250", are contrary to the evidence. In this connection it is argued that plaintiff failed to make adequate assays or tests and otherwise failed to operate in a good and workmanlike manner. However, the testimony of A. W. Jeffers, an expert in flotation mining process who aided plaintiff in establishing an efficient recovery procedure, testified

that the milling procedure used was an efficient one in contemplation of the low grade of ore shipped and that the resulting 75 per cent of ore shipped was considered a good recovery. The evidence further shows that out of each shipment samples were taken by plaintiff and assays made to determine the molybdenum and copper content of the ore. The record further shows that a public accountant was employed by plaintiff from July, 1954, to February, 1955, during which period he kept accurate and complete account of all transactions between plaintiff and the defendants under the contract here involved and made periodic audits of the account. We are unable to find any evidence in the record that plaintiff refused to furnish defendants with the information therein contained.

The award of $8,250 for costs to plaintiff in maintaining the mill in operating condition for the remainder of the contract was based on the fact that defendants agreed to mill not less than 9,000 tons of ore under the agreement at 50 tons per day and the further evidence that the salaries of the three men composing the skeleton crew required by defendants amounted to the sum of $8,250 for the time they were engaged by plaintiff under the contract.

The weight and sufficiency of the evidence and the inferences to be drawn therefrom were matters for the trial court and where, as here, there is substantial evidence to support the foregoing findings, they cannot be disturbed on appeal. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689] ; *Dillard* v. *McKnight*, 34 Cal.2d 209, 223 [209 P.2d 387, 11 A.L.R.2d 835].)

It is claimed that plaintiff did not operate in an economical manner. There was direct and substantial evidence to the contrary and the record shows that the costs of milling were greatly increased by the failure of defendants to deliver the quantity and quality of ore promised by them in the contract and shown by the test sample submitted. Under the circumstances shown by the record, the finding of due performance of the contract by plaintiff must stand.

Defendants claim that plaintiff breached the contract by failing to deliver the molybdenum concentrates as agreed. However, the testimony shows that plaintiff withheld delivery for a time because of bills which were unpaid by the defendants and that at a later date plaintiff shipped the concentrates and received $3,907.30 therefor, which was applied to payment of said bills by arrangement with Mr. Patrick, one of the defendant partners.

Finally, defendants argue that the damages awarded

by the court were excessive. However, the record shows that the court found that from the first week in August, 1954, until September 15, 1954, plaintiff expended the sum of $14,470.64 in milling ore under the contract and awarded plaintiff profit thereon in the amount of $7,369.12, as provided in the contract, together with depreciation on its equipment in the amount of $750. The court further found that defendants failed and refused to deliver to plaintiff 8,259 tons of ore, all in violation of the contract and that by reason of such failure, plaintiff sustained damages in the further sum of $24,777 for loss of future profits. The evidence indicates that plaintiff could have reasonably expected to make said profits if defendants had delivered the 9,000 tons of ore specified in the contract rather than 741 tons actually shipped. ██ Damages may be recovered for loss of future prospective profits where, as here, they may fairly be supposed to have entered into the contemplation of the parties when they made the contract and are reasonably certain. (*Grupe* v. *Glick*, 26 Cal.2d 680, 688 [160 P.2d 832]; *Hoag* v. *Jenan*, 86 Cal.App.2d 556, 563 [195 P.2d 451].)

Judgment affirmed.

Griffin, Acting P. J., and McCabe, J. pro tem.,* concurred.

A petition for a rehearing was denied July 15, 1958, and appellants' petition for a hearing by the Supreme Court was denied August 21, 1958. Traynor, J., was of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.